IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | | |
|---|---|---|
| SHERIE C. CAMPBELL, | ) | |
| | ) | CASE NO. CV 06-138-S-MHW |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **MEMORANDUM DECISION** |
| | ) | **AND ORDER** |
| ALEC SARRAZOLLA, a Garden City | ) | |
| Police Officer; CRAIG WALLACE, | ) | |
| a Garden City Police Officer; JAMES L. | ) | |
| BENSLEY, Garden City Chief of Police; | ) | |
| the CITY OF GARDEN CITY, an Idaho | ) | |
| municipal corporation and political | ) | |
| subdivision of the state of Idaho; and | ) | |
| DOES 1-10. | ) | |
| | ) | |
| Defendants. | ) | |

Currently pending before the Court is the following motion: 1) Defendants' Motion to Dismiss, or in the Alternative, Motion for Summary Judgment (Docket No. 4.)  For the reasons that follow, the Motion will be granted.

## I.
## Background

On August 3, 2005, Garden City Police Officers Alec Sarrazolla ("Defendant Sarrazolla") and Craig Wallace ("Defendant Wallace") entered the home of Plaintiff Sherie

Campbell ("Plaintiff"), who was not home, without a warrant.  Plaintiff has brought suit against

Defendants Wallace and Sarrazolla, Garden City Chief of Police James L. Bensley ("Defendant

Bensley") and the City of Garden City ("Garden City").   Plaintiff alleges civil rights violations

under 42 U.S.C. § 1983, and of the Fourth and Fourteenth Amendments of the United States

Constitution.

On the August 2, 2005, Plaintiff left work early for personal matters and had been

expressing her frustration to Sandra Moser ("Moser"), her immediate supervisor at Idaho

Counties Risk Management Program ("ICRMP"), concerning a production schedule.  Moser, the

Member Services Coordinator,  worked late that night working on Plaintiff's project because of

the lack of progress. (Affidavit of Sandra Moser in Support of Motion to Dismiss, or, in the

Alternative, Motion for Summary Judgment, "Moser Affidavit," Docket No. 14, ¶¶  2-3).

Plaintiff later returned to work, stating she wanted to work while it was quiet at the office and

wanted to make up some time but that she did not intend to stay late.  Moser told Plaintiff to

keep track of her time because she would be given comp time instead of overtime pay for extra

hours worked.  (Moser Affidavit  ¶¶  2-3).  Plaintiff contends that Moser told her to use this

comp time the following day and that was why she did not show up for work the next day.

(Affidavit of Plaintiff in Support of Memorandum in Opposition to Defendants' Motion to

Dismiss, or, in the Alternative, Motion for Summary Judgment, "Plaintiff Affidavit," Docket

No.10, ¶ 2).  Moser claims that she had no discussion with Plaintiff about her taking time off

from work the next day. Moser states she would not have allowed her to take the next day off

**Memorandum Decision and Order - Page 2**

because the project was already behind schedule and another employee in the department was on vacation at the time.  (Moser Affidavit ¶ 4).[1]

The following day, August 3, 2005, Plaintiff failed to show up at work, the first time she either did not show up or call to advise someone at the office that she would not be in.  At about 10 a.m., Moser attempted to call on her cell phone but there was a message to the effect that the cell phone was out of service.[2]  Moser contacted Adecco (the employment agency which assigned Plaintiff to work at ICRMP) to get Plaintiff's home phone number but they would not give the number out. Adecco told Moser that Plaintiff had worked for them for several years and never failed to show up without calling first.  Adecco later contacted Moser and told her that they attempted to call Plaintiff at her home, but that the home telephone had been disconnected. Shortly thereafter, flowers were delivered to ICRMP for Plaintiff from someone named "Larry Neuberger" ("Neuberger").

Moser was unaware of Plaintiff's relationship with Neuberger.  However, other employees began to tell Moser what Plaintiff had told them about her relationship with Neuberger.  She was told Plaintiff had been in an abusive relationship with Neuberger and was worried he may try to harm her.[3]  Plaintiff had given a physical description of him to the ICRMP

---

[1]  This dispute is inconsequential as it does not matter to the qualified immunity analysis whether Plaintiff did in fact clear her next day off with Moser as Defendant Bensley was informed that Plaintiff did not show up for work and had not called in.  He was never informed of this alleged discussion.

[2] Plaintiff claims she received no phone calls on her cell phone from anyone inquiring about her whereabouts on August 3, 2005.  (Plaintiff Affidavit, ¶ 5.)  There is evidence, discussed *infra*, that Plaintiff stated her phone had been shut off that day.

[3]  Plaintiff claims that she never told her co-workers Neuberger was abusive, only that there he behaved oddly sometimes.  (Plaintiff Affidavit, ¶ 4.)  Again this is inconsequential to the qualified immunity analysis as the Defendants were told that Plaintiff has said Neuberger was abusive and she was afraid of him.  There is evidence, discussed *infra*, that Plaintiff was trying to get a restraining order against Neuberger

receptionist and provided instructions that he was not to be allowed to see her and the reception

was not to transfer any calls from him to her.  Based on all of this, Moser was very concerned for

Plaintiff's welfare and even believed that she was probably dead.  Moser informed Lynette

McHenry ("McHenry"), ICRMP Associate General Counsel and Claims Manager, about her

concerns.  (Moser Affidavit, ¶ 5).

On the afternoon of August 3, 2005, Defendant Bensley received a telephone call from

from McHenry.  McHenry requested that Garden City police officers check on the welfare of

Plaintiff.  McHenry told Defendant Bensley that Plaintiff worked at ICRMP and had failed to

show up at work that day or call to explain her absence.  McHenry told Defendant Bensley that

telephone calls to Plaintiff's residence went unanswered.  She also stated that it was unusual and

out of character for Plaintiff to not show up at work or not call if she was going to be absent from

work.  McHenry was concerned because she had been told that Plaintiff had recently made

statements to various ICRMP co-workers about her abusive ex-boyfriend, Neuberger, and her

concern that he may try to contact and/or harm her.  McHenry told Bensley that these statements

by Plaintiff to her co-workers, Plaintiff not showing up for work and not calling to explain her

absence, coupled with the fact that a bouquet of flowers had arrived for Plaintiff that day at the

ICRMP offices with a card signed from "Larry" intensified her fear for Plaintiff's safety.

McHenry did not know Plaintiff's address but provided several possible addresses for

her.  Bensley contacted Defendant Wallace around 4:30 p.m. on August 3, 2005, and asked him

to conduct a welfare check of Plaintiff, provided him with the potential addresses, and informed

him about Plaintiff's relationship with Neuberger.  Bensley did not direct that Plaintiff be

arrested or that any property be seized, just that she be checked on.  (Affidavit of Defendant

James L. Bensley in Support of Motion to Dismiss, or, in the Alternative, Motion for Summary Judgment, "Bensley Affidavit," Docket No. 4, at ¶ 2-6). Plaintiff points out that none of these addresses provided to Bensley were in Garden (Plaintiff's Memorandum in Opposition to Defendants' Motion to Dismiss, or, in the Alternative, Motion for Summary Judgment, "Plaintiff Opposition," Docket No.7, ¶¶ 2-3).

Defendant Bensley advised Defendant Wallace of all the information that had been provided by McHenry. Also, that there was going to be a missing person's report filed with the Boise Police Department. Defendant Wallace directed two other Garden City Police Department Detectives, Mark Furniss ("Furniss") and Defendant Sarrazolla to try to locate Plaintiff at the addresses that had been provided by McHenry. They were unsuccessful.

Defendant Wallace then asked Detective Jason Pietrzak ("Pietrzak"), accompany him to attempt to locate Neuberger. They went to Neuberger's apartment but Defendant Wallace could not remember his apartment number so he spoke with a neighbor who said she knew Neuberger. The neighbor informed Defendant Wallace that Neuberger had frequent arguments in his house and believed him to be involved in drug activity. When Defendant Wallace knocked in Neuberger's door, a male answered and identified himself as Neuberger. When asked about Plaintiff, Neuberger acted like he did not know her but then admitted she was his girlfriend and that he had sent flowers to her work that morning. Neuberger told Defendant Wallace that he had just been at Plaintiff's house, where she informed him that she had been at Lucky Peak Reservoir all day. He also told the officer that Plaintiff had just gotten out of the shower when he had spoke with her at her home. Neuberger could not remember Plaintiff's address but agreed to show the officers where she lived. Defendant Wallace believed Neuberger was acting

suspicious and questioned his story.  (Affidavit of Defendant Craig Wallace in Support of

Motion to Dismiss, or, in the Alternative, for Summary Judgment, "Wallace Affidavit", Docket

No. 4, ¶¶ 2-4).

Defendant Wallace and Pietrzak had Neuberger take them to Plaintiff's residence and

called Defendant Sarrazolla to accompany them.  Defendant Sarrazolla arrived at Plaintiff's

residence at 1406 North 17th Street in Boise shortly after Defendant Wallace, Pietrzak and

Neuberger.  (Wallace Affidavit ¶ 5).  Defendants Wallace and Sarrazolla approached the front

door and knocked and announced their presence while Pietrzak stayed with Neuberger.  The

front door to the house was ajar.  A small dog came to the door, it was nervous and urinated in

the entry-way of the house.  Neuberger called the dog and it came to him.  Defendant Wallace

asked him to hold the dog and he did so. None of the officers were aggressive towards the dog.

(Wallace Affidavit ¶ 6).  Defendant Sarrazolla thought it was suspicious that the door was open

yet no one answered to the knocks.  He went to the back of the residence and could not see

anyone through the windows.  (Affidavit of Defendant Alec Sarrazolla in Support of Motion to

Dismiss, or, in the Alternative, Motion for Summary Judgment, "Sarrazolla Affidavit," Docket

No. 4, ¶ 5).  Plaintiff's car was not in the carport at this time.  (Plaintiff Affidavit, ¶ 8).

Based upon all the information that had been provided to Defendants Wallace and

Sarrazolla by Defendant Bensley and their own observations at the scene, including the front

door being ajar a couple of inches, these two Defendants decided to enter Plaintiff's house to

check on her welfare.  Pietrzak stayed outside with Neuberger.  Defendants Wallace and

Sarrazolla found the house in order when they entered, there was no signs of a struggle, and the

shower was wet which was consistent with Neuberger's statement that Plaintiff had just taken a

**Memorandum Decision and Order - Page 6**

shower when he had seen her earlier. (Wallace Affidavit, ¶¶ 7-8).  Defendant Sarrazolla found a

sliding glass door open to the backyard and closed it, but did not lock it.   The officers noticed a

drug-testing form for a job at the Boise Airport on the kitchen counter in plain view. (Sarrazolla

Affidavit, ¶ 6).  The officers then exited the house.

Defendant Wallace spoke with Plaintiff's neighbor who said he had seen Plaintiff earlier

that day.  The officer did not ask any other questions nor imply Plaintiff had done anything

wrong.  (Wallace Affidavit, ¶ 9).  Defendant Sarrazolla asked Neuberger if Plaintiff was

applying for a job at the Boise Airport and was informed by Neuberger that Plaintiff's son was

applying for a job there.  Defendant Sarrazolla called the Boise Airport to see if they knew where

Plaintiff's son worked.  He also called the Boise Airport Police to see if they knew what drug

testing service the airport used.  He was unable to obtain any useful information.  The officer did

not tell anyone that he was looking for a missing person nor did he give the impression that

Plaintiff's son was in trouble.   Defendant Sarrazolla gave Neuberger his business card and told

him to call if he spoke with Plaintiff.  The dog was put back inside and the front door was closed

but not locked, as the officers were unsure if Plaintiff had a key.  All the officers left the scene.

At that time, Defendant Sarrazolla no longer believed Plaintiff to be in danger.  (Sarrazolla

Affidavit, ¶¶ 6-7).

After Plaintiff returned home from taking her son to an appointment for the job he was

applying for at the Boise Airport, she found a puddle of dog urine near her front door and in the

dining room. The dog was in the backyard and the doors were all closed.  She was informed of

the police's visit to her home and became concerned and angry.  After the visit to her house by

the police, Plaintiff claims her dog became aggressive and unpredictable and eventually had to

be put to sleep.  Plaintiff was told by the veterinarian that there was evidence of trauma to the

dog's head.[4]  (Plaintiff Affidavit, ¶ 7).

Around 8 p.m. on the evening of August 3, 2005, Plaintiff phoned Defendant Sarrazolla

at home and asked him what happened.  He explained the situation to her and she stated that she

understood.  He then phoned Defendant Wallace to let him know that he had spoken with

Plaintiff. (Sarrazolla Affidavit, ¶ 8).  Defendant Wallace then called Plaintiff to explain the

situation to her.  Plaintiff told him she did not go to work because she decided to quit her job and

never called anyone at ICRMP to tell them of her decision.  She did not seem to have a problem

with the efforts to check on her welfare.  (Wallace Affidavit, ¶ 11).  Around 9 p.m., Plaintiff

phoned Defendant Sarrazolla again, was more inquisitive about what happened and asked if

Garden City handled all missing persons cases the way hers was handled.  (Sarrazolla Affidavit,

¶ 9).

The following day, August 4, 2005, when Moser arrived at ICRMP there was a voicemail

message from Plaintiff in which she states that she did not come into work because she "can't

handle working there" and that she was sorry to have scared everyone but her "phone got shut

off."  (Moser Affidavit, Exhibit A).

## II.
## Standard of Review

A motion to dismiss should not be granted "unless it appears beyond doubt that Plaintiff

can prove no set of facts in support of his claim that would entitle him to relief."  *Clegg v. Cult*

*Awareness Network,* 18 F.3d 752, 754 (9th Cir. 1994).  When a complaint or portion thereof is

---

[4]  Defendants assert that this statement by the veterinarian is hearsay and should be disregarded as affidavits must be based on personal knowledge and contain admissible evidence pursuant to Rule 56(e).

**Memorandum Decision and Order - Page 8**

tested as to the legal sufficiency of the claims for relief, all allegations of material fact in the complaint are taken as true and construed in the light most favorable to the nonmoving party. *Buckey v. County of Los Angeles,* 968 F.2d 791, 794 (9th Cir. 1991), *cert. denied,* 506 U.S. 909 (1992).

Generally, the Court may not consider any material beyond the pleadings in ruling on a motion to dismiss under Fed. R. Civ. P. 12(b)(6). *Branch v. Tunnel*, 14 F.3d 449, 453 (9th Cir. 1993), *cert. denied*, 114 S.Ct. 2704 (1994). Furthermore, if a Rule 12(b)(6) motion raises "matters outside the pleading" and these matters are "presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56." *Id.* at 453.

Since the Court will be considering matters, i.e. affidavits, outside the pleadings the motion will be treated as one for summary judgment. When reviewing a motion for summary judgment, the proper inquiry is whether "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c) (1993). A moving party who does not bear the burden of proof at trial may show that no genuine issue of material fact remains by demonstrating that "there is an absence of evidence to support the non-moving party's case." *Celotex Corp v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L. Ed. 2d 265 (1986). Once the moving party meets the requirement of Rule 56 by either showing that no genuine issue of material fact remains or that there is an absence of evidence to support the non-moving party's case, the burden shifts to the party resisting the motion who "must set forth specific facts showing that there is a genuine issue for trial."

**Memorandum Decision and Order - Page 9**

*Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 256, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).  It is not enough for the [non-moving] party to "rest on mere allegations of denials of his pleadings."  *Id.*  Genuine factual issues must exist that "can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party."  *Id.,* at 250.

"When determining if a genuine factual issue . . . exists, . . . a trial judge must bear in mind the actual quantum and quality of proof necessary to support liability."  *Id.,* at 254.  "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff."  *Id.* at 252.

The Ninth Circuit has consistently applied the standard for granting summary judgment. *Musick v. Burke,* 913 F.2d 1390 (9th Cir. 1990); *Pelletier v. Federal Home Loan Bank,* 968 F.2d 865 (9th Cir. 1992); *Bieghler v. Kleppe,* 633 F.2d 531 (9th Cir. 1980).

In determining whether a material fact exists, facts and inferences must be viewed most favorably to the non-moving party.  To deny the motion, the Court need only conclude that a result other than that proposed by the moving party is possible under the facts and applicable law.  *Aronsen v. Crown Zellerbach,* 662 F.2d 584, 591 (9th. Cir. 1981).

The Ninth Circuit has emphasized that summary judgment may not be avoided merely because there is some purported factual dispute, but only when there is a "genuine issue of material fact."  *Hanon v. Dataproducts Corp.,* 976 F.2d 497, 500 (9th Cir. 1992).

> In order to withstand a motion for summary judgment, the non-moving party:  (1) must make a showing sufficient to establish a genuine issue of fact with respect to any element for which it bears the burden of proof; (2) must show that there is an issue that may reasonably be resolved in favor of either party; and (3) must come forward with more persuasive evidence than would otherwise be necessary when the factual context makes the non-moving party's claim implausible.

*British Motor Car Distrib. Ltd. v. San Francisco Automotive Indus. Welfare Fund,* 882 F.2d 371, 374 (9th Cir. 1989).

## III.
### Defendants Sarrazolla, Wallace and Bensley's Motion for Summary Judgment

**A.    No Constitutional Violation**

Defendants Sarrazolla, Wallace and Bensley (in his individual capacity) assert they are entitled to summary judgment on the ground that no constitutional violation occurred, and even if there were some violation, the Constitutional right was not clearly established and they are entitled to qualified immunity.

The threshold question that lower courts are to address is whether, taken in the light most favorable to the party asserting the injury, the facts alleged show that the officer's conduct violated a constitutional right. *Saucier v. Katz*, 533 U.S. 194, 201, 121 S. Ct. 2151, 150 L. Ed. 2d 272 (2001). If not, then "there is no necessity for further inquiries concerning qualified immunity." *Id.* If so, then "the next sequential step is to ask whether the right was clearly established." *Id.* A constitutional right is clearly established when "on a favorable view of the parties' submissions . . . it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Id.* at 201-02. Defendants Sarrazolla, Wallace and Bensley argue their entry into the Plaintiff's home falls within the emergency aid exception to the warrant requirement of the Fourth Amendment. To justify a warrantless search under the emergency doctrine the following three requirements must be satisfied: (1) the police must have reasonable grounds to believe that there is an emergency at hand and an immediate need for their assistance for the protection of life or property; (2) the search must not be primarily motivated by intent to

arrest and seize evidence; and (3) there must be some reasonable basis, approximating probable cause, to associate the emergency with the area or place to be searched.  *U.S. v. Stafford*, 416 F.3d 1068, 1073-74 (9th Cir. 2005).  Courts are to ascertain whether or not the emergency exception applies based on the totality of the circumstances.  *Id*. at 1074.   The emergency doctrine is derived from police officers' community caretaking function.  *U.S. v. Bradley*, 321 F.3d 1212, 1214 (9th Cir. 2003).

Under the first prong in this analysis, the police must have reasonable grounds to believe that there is an emergency at hand and an immediate need for their assistance to protect life or property.  *Stafford*, 416 F.3d at 1073.  In a recent Ninth Circuit case, the court held that the first prong was met where a father had phoned the police concerned about his daughter's welfare because she could not be reached for several days, her car was in the driveway when the officers arrived at the address given by her father, a neighbor suggested that she should be home, and there was a lack of response to repeated knocking and phone calls to the daughter's phone went unanswered.  *Martin v. City of Oceanside*, 360 F.3d 1078, 1082 (9th Cir. 2004).

Defendants argue they had reasonable grounds to believe that there was an immediate need for assistance based on the followings facts: Plaintiff's employer called the Garden City police and was concerned for her safety; Plaintiff had not shown up for work nor called to explain her absence and this was said to be out of character for her; Plaintiff had told co-workers about an abusive ex-boyfriend that may try to harm her; Plaintiff received flowers at work that day from her ex-boyfriend; Defendants were told by Neuberger's neighbor of loud arguments and concerns of drug activity occurring in his home; Neuberger hesitated when asked about Plaintiff and his explanation for her absence from work - she was at Lucky Peak Reservoir - was

inconsistent with the type of person the officers had been told that Plaintiff was; there was no response to the officers' knocks and announcement at Plaintiff's residence; and the front door was ajar.

In her response argument, Plaintiff points out several differences between the case at hand and the *Martin* case cited by Defendants. The Plaintiff points out that the concern here was from an employer that did not even know Plaintiff's address, not a relative and Plaintiff had not been heard from for a matter of hours, not days. Plaintiff mentions that neither Defendants nor ICRMP bothered to follow up with the florist to confirm or dispel any fears related to the flowers. Additionally, Plaintiff remarks that once Defendants did receive information about Plaintiff's whereabouts from Neuberger, they chose to disregard it but did rely on Neuberger to take them to Plaintiff's residence. Another point of contrast that Plaintiff makes between this case and *Martin*, is that there was no vehicle present at Plaintiff's residence, whereas in *Martin* there was a car in the driveway, indicating that the daughter should be home. Plaintiff claims that the only indication that anyone was at the residence at the time the officers were there was the fact that the front door was ajar. As well, she notes that in *Martin*, the police had additional information from a neighbor who stated that the daughter should be home, and no such information existed in the present case.

Defendants believe the distinctions noted by Plaintiff, as whether it is a relative or employer is concerned about a potential victim and how long they have been concerned, are not persuasive as it is objectively reasonable to believe that Plaintiff was in danger and was in need of assistance whether that information came from her father or her employer, and whether she missed work for three days or one day. In response to Plaintiff's argument that Defendants

should have talked to a neighbor before entering her residence, Defendants argue that for purposes of qualified immunity, actions of the Defendants are to be judged by the decision they made at the scene, rather than with 20/20 hindsight, since an argument can always be made that law enforcement officers should have done something different or in addition to what they did do at the scene. *See Billington v. Smith*, 292 F.2d 1177, 1185-91 (9th Cir. 2002). In addition, Defendants urge that police officers should not be required to carry around a copy of the *Martin* case and see how the situation at hand compares with legal precedent. Law enforcement officers are not expected to have the same understanding of the law as trained lawyers and qualified immunity is designed to protect all but the plainly incompetent who knowingly violate the law. *See Davis v. Scherer*, 468 U.S. 183, 104 S. Ct. 3012, 82 L. Ed. 2d 139 (1984); *Malley v. Briggs*, 475 U.S. 335, 106 S. Ct. 1092, 89 L. Ed. 2d 271 (1986).

The second prong that must be satisfied is that the search must not be motivated primarily by an intent to arrest or seize evidence. *Stafford*, 416 F.3d at 1073. In *Martin*, the Ninth Circuit found this prong to be satisfied because the "only reason" the officers were at the home was in response to the request of the father to "check the welfare" of his daughter. 360 F.3d at 1082. Likewise, this prong is clearly satisfied in this case. There are no facts whatsoever that indicate the Defendants were seeking to arrest Plaintiff or seize any of her property and indeed she was not arrested and nor was any property seized. Defendants Wallace and Sarrazolla stated the only reason they entered Plaintiff's home was to check on her safety and not to arrest her or seize any evidence. That this prong has been satisfied is not disputed by Plaintiff.

The third prong to be satisfied is there must be a reasonable basis to associate the potential emergency with the place entered or searched. *Stafford*, 416 F.3d at 1074. In *Martin*,

**Memorandum Decision and Order - Page 14**

the Ninth Circuit found that the officers reasonably concluded that a potential emergency

situation could be located inside Plaintiff's home because of the father's concern about his

daughter, the neighbors indication that the daughter should be in the residence, the presence of

her car in the driveway, and the unexplained failure to respond to the officers knocking on the

door.  360 F.3d at 1082.

Defendants assert that this prong is satisfied because Neuberger identified the house as

Plaintiff's residence and based on the information told by ICRMP to Defendants, coupled with

the door being ajar and no one answering to their knocks on the door, there was a reasonable

basis to associate the potential emergency with Plaintiff's residence.  Defendants point out that

once inside, they limited their search to determine whether there was evidence of struggle or

harm to Plaintiff.[5]  Once it was determined there was no evidence of struggle or harm and they

saw that the shower floor was wet, consistent with Neuberger's statement that Plaintiff had just

taken a shower when he had seen her, they exited the residence no longer believing her to be in

harm's way.

Plaintiff asserts there was no information that would associate an emergency with the

residence of 1406 North 17th Street until Neuberger took the officers to that location.  Plaintiff

claims that Defendants acted only on speculation and assumption in deciding to enter the house.

She further maintains that this prong is not met because Defendants relied on Neuberger's

statement that the house was in fact Plaintiff's residence when they had found Neuberger

suspicious and not believable as to his other statements regarding her whereabouts.  Plaintiff

states that Defendants were purely speculating that a struggle may have occurred in Plaintiff's

---

[5]  The court in *Martin* points out that "the officers did no more than search the areas of [the home] where [the daughter] could potentially be..."

residence.  Plaintiff argues that the Defendants engaged in pure speculation that some harm may have inflicted on the Plaintiff at her residence, when on the one hand they rely on Neuberger to take them to her house, but discount his other statements that he had seen Plaintiff and she was alright. Plaintiff asserts that this can not provide a reasonable basis for associating her residence with any potential emergency.

In response, Defendants point out that the police officers in *Martin* also made a number of assumptions based on the information available to them that eventually turned out to be unfounded and in that case, the officer still had immunity.

Although the emergency exception to the warrant requirement is typically applied in extreme cases where police are responding to a report of a gunshot injury or something similar, the emergency exception has been invoked in less severe instances as well.  *Compare U.S. v. Russell*, 436 F.3d 1086 (9th Cir. 2006) *and Martin*, 360 F.3d 1078.   The circumstances in *Martin* were very similar to the case at hand.  In both circumstances, a concerned party phoned the police because they were unable to get in contact with the person in question and were very concerned for that person's welfare, the police then went to the residences of these individuals, and upon belief that the person was home, either because a car was in the driveway or the door was ajar, entered the home simply to make sure that the individual was safe.

Of course, there are a few minor differences between the two cases that are worthy of discussion.  In *Martin*, the daughter's car was parked in the driveway, whereas the Plaintiff's car was not in front of her house when the officers arrived as she was taking her son to an appointment.  Additionally, in this case, Neuberger told the officers he had just spoken with Plaintiff and they she had been at Lucky Peak Reservoir all day, thus accounting for her absence

**Memorandum Decision and Order - Page 16**

from work and not answering her phone.  No such similarity occurred in *Martin*.  However, based on what the Defendants had been told about Plaintiff's relationship with Neuberger, they had reason not to trust his statement and further, based on what they knew about the relationship, had reason to believe that Plaintiff may have been harmed by Neuberger.  In comparison, there was no specific basis for fear of harm to the individual in *Martin* other than she could not be reached.  In this case, Plaintiff had told co-workers that she was involved in an abusive relationship and that she feared Neuberger would harm her, this was relayed to the Defendants and constituted a concrete basis for their belief that Plaintiff might be in danger or have been harmed.  Even without this kind of information in *Martin*, the Ninth Circuit still found that the officers had a reasonable belief to investigate a potential emergency situation.

As stated above, the second prong of the emergency exception to the warrant requirement is not disputed by Plaintiff, thus discussion of the second prong can be forgone.

As to the third prong, the Ninth Circuit gave four reasons for why it believed the officers came to a reasonable conclusion that a potential emergency could be located inside the home in question: the father's concern about his daughter, the neighbor's indication that the daughter should be in the residence, the presence of her car in the driveway, and the unexplained failure to respond to knocking on the door.  Two of these circumstances are unequivocally present in this situation: people were concerned about the Plaintiff's safety and their was an unexplained failure to respond to knocking at the door.  Additionally, although there was no car present, the front door was ajar. The Defendants found it suspicious that a door would be ajar and yet no one would be home to answer to their knocks.  This is comparable to a car being present and no one responding to knocks on the door.  Defendants were told by Neuberger that the house was

Plaintiff's residence, the door was ajar, a dog came to the door, but yet no one responded to knocking.  Based on this and what Defendants had been told by Plaintiff's employer, Defendants had a reasonable basis to believe that a potential emergency had occurred or was occurring in Plaintiff's residence.

There are also some additional facts that bear on Plaintiff's claims.  First, there is audio documentation from Plaintiff where she stated she did not come into work on August 3, 2005, because she could not "handle it" and had decided to quit, refuting her statement that she had told her supervisor she was planning on using her comp time that day.[6]  As well, there is documentary evidence that Plaintiff was trying to get a restraining order against Neuberger, indicating there were problems between Plaintiff Neuberger and refuting Plaintiff's statement that she never was afraid of Neuberger.[7]  Nevertheless, even if these could be determined to be "genuine issues," the facts are not material because they do not change what the Defendants reasonably believed when they entered Plaintiff's residence.

Plaintiff seems to suggest that the Court can find a constitutional violation based on the fact that the Garden City Police were actually in the City of Boise when they entered the residence and that the Boise City Police Department was the only appropriate agency to conduct a welfare check.  There is a cross-deputization agreement between Boise, Garden City and Meridian Police Departments in which it is agreed that the three departments be "granted lawful authority to exercise the powers of police officers within the jurisdiction of others" and that in

---

[6] Exhibit B to the Moser Affidavit is a compact disk recording of a voicemail message left by Plaintiff that Moser received on August 4, 2005.

[7] Exhibit A Second Affidavit of Defendant James L. Bensley in Support of Motion to Dismiss, or, in the Alternative, Motion for Summary Judgment is a Claim for Damage or Injury filed by Plaintiff against Garden City with City of Garden City.

**Memorandum Decision and Order - Page 18**

situations where police action is "necessary or should otherwise be taken, each agency is authorized to respond and take appropriate police action within jurisdiction of the others." (Exhibit A, Plaintiff's Complaint for Damages and Demand for Jury Trial, "Complaint," Docket No. 1). Additionally the Garden City Police Department policy manual states that they will aid "participating communities *when requested.*"(Complaint, Ex. B) (emphasis added). So although this cross-deputization agreement exists, Plaintiff seems to take issue because Defendants were not *requested* to assist the Boise Police Department in an area outside their jurisdiction. Also, the cross-deputization agreement required each officer to maintain the standards required by that officer's departmental policies and procedures, and Garden City's policy includes the giving of aid outside a jurisdiction when *requested*.

Defendant Wallace states that Defendant Bensley told him during their initial conversation that the Boise City Police Department was busy on a vehicle pursuit, so he asked Defendant Wallace to do the welfare check. (Wallace Affidavit, ¶ 2). Defendants also assert that whether they acted outside their jurisdiction or not is not at issue, but whether a Fourth Amendment violation occurred. Further, even if they did act outside their jurisdiction, that alone was not a violation of the Fourth Amendment and thus not relevant to the qualified immunity analysis. Defendants cite to a case in which the Idaho Supreme Court indicates that acting outside one's territorial jurisdiction does not create a constitutional violation. *See State v.Benefiel*, 131 Idaho 226, 953 P.2d 976 (1998) (even though officer was outside his jurisdiction, he was still acting as law enforcement officer and not private citizen...evidence in the case was not suppressed because regardless of officer acting outside his jurisdiction, there was no Fourth Amendment violation). The Court agrees. Whether the Garden City officers were specifically

"requested" to assist the Boise Police Department is not relevant to he question of whether there was a Fourth Amendment constitutional violation.

**B.      In the Alterative, Qualified Immunity Applies**

In the alternative, Defendants Sarrazolla, Wallace and Bensley argue that the law was not clearly established and thus they are entitled to qualified immunity.  Government officials performing discretionary functions are entitled to qualified immunity from civil damages liability as long as their actions could have been reasonably thought to be consistent with the rights they are alleged to have violated.  *Anderson v. Creighton,* 483 U.S. 635, 638, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987).   In determining whether a right is clearly established, "the contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right."  *Id*.  The relevant dispositive inquiry is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted.  *Id*.  *See Menotti v. City of Seattle*, 409 F.3d 1113, 1152 (9th Cir. 2005).  This does not mean that an official action will be protected by qualified immunity only if the very action in question has not been held unlawful; but it means that in light of pre-existing law, the unlawfulness must be apparent. *Anderson v. Creighton*, 483 U.S. 635, 640 (1987).   This inquiry is wholly objective and is undertaken in light of the specific factual circumstances of the case.  *Brittain v. Hansen*, 451 F.3d 982, 988 (9th Cir. 2006).

Qualified immunity seeks to protect all but the plainly incompetent or those who knowingly violate the law.  *Sorrels v. McKee*, 290 F.3d 965 (9th Cir. 2002).  The concern of the immunity inquiry is to acknowledge that reasonable mistakes can be made as to the legal constraints on particular police conduct.  *Saucier*, 533 U.S. at 205.  It is sometimes difficult for a

reasonable officer to determine how the relevant legal doctrine will apply to the factual situation the officer confronts.  *Id*.  If the officer's mistake as to what the law requires is reasonable, the officer is entitled to the immunity defense.  *Id*.

In the alternative to their first argument, Defendants assert that given the circumstances, an objectively reasonably prudent officer would not know the emergency aid exception did not apply to this situation.  In response, Plaintiff argues that it should be remembered that the emergency exception is an *exception* and that no police officer should be able to reasonably rely on an exception to the warrant requirement unless it is well established.  Plaintiff asserts that the relevant right here is the right to be free from unreasonable searches and since that right is well established, there is no need to inquire into whether a reasonable police officer would know that the emergency aid exception did not apply to his or her situation.

Plaintiff's argument that the relevant right is the general right of freedom from unreasonable searches and seizures is without merit.  Cases examining qualified immunity in the context of a Fourth Amendment right have examined whether an exception to the general warrant requirement was clearly established.  *See Calabretta v. Floyd*, 189 F.3d 808 (9th Cir. 1998) (examining whether the exigency exception was clearly established to justify a warrantless entry and search by a social worker).

To determine if the law is clearly established, the Court surveys the legal landscape and examines those cases most like the present case.  *Id*. at 540.  In the Ninth Circuit, the emergency aid exception is well-established to a certain degree.  *See U.S. v. Cervantes*, 219 F.3d 882 (9th Cir. 2000).  The three-prong test was adopted by the Ninth Circuit in *Cervantes* and has been applied in many subsequent cases.  *See Russell*, 436 F.3d 1086; and *Martin*, 360 F.3d 1078.

**Memorandum Decision and Order - Page 21**

*Martin v. City of Oceanside* is very similar to the present case.  The Ninth Circuit in that case applied the *Cervantes* three-prong test, held it was satisfied, and thus no constitutional violation was found.  *Martin*, 360 F.3d 1078.  Even if Plaintiff were to arguably establish that the emergency exception did not apply, and therefore some constitutional violation occurred, the Defendants would be entitled to qualified immunity.  The facts of this case so closely parallel the facts in *Martin*, an objectively reasonable office would not clearly know that the emergency exception would not apply.  Due to this pre-existing law, based on facts very analogous to the situation at hand, the unlawfulness of Defendants' action was not apparent and qualified immunity would apply.

## IV.
## Garden City and Defendant Bensley's Motion for Summary Judgment

Garden City and Defendant Bensley (in his official capacity) assert they are entitled to summary judgment because no constitutional violation has occurred.  The reasoning behind this argument is the same as detailed above.  As they assert there is no constitutional violation, it follows that they assert that any constitutional claim against the governmental entity must fail as well.  *See City of Los Angeles v. Heller*, 475 U.S. 796, 106 S. Ct. 1571, 89 L. Ed. 2d 806 (1986) (holding that if a police officer was not liable for inflicting a constitutional injury then there could be no liability for the city and members of police commission either).

Additionally, Garden City and Defendant Bensley argue that Plaintiff's claim against them must fail because Plaintiff has failed to show that Garden City has a policy, practice or custom of conducting extrajudicial welfare checks.  Defendants points to Garden City's Police Department policy (Complaint, Ex. B), the cross-deputization agreement (Complaint, Ex. A), and Idaho Code Section 67-2337 to show that Garden City does not have a policy, practice or

custom of conducting extrajudicial welfare checks.  These documents reflect the policy and practice of the Garden City Police Department.  Since Plaintiff is arguing that Defendants acted outside these policies and practices by conducting an extraterritorial welfare check without a request, which is against their policy, then, Defendants assert, it is clear that this alleged "violation" did not occur pursuant to policy, practice or custom and thus Garden City cannot be liable.

Plaintiff responds that although Garden City's policy and cross-deputization agreement can be read and applied consistent with state law, it is evident that this policy and agreement are implemented in such a fashion as to encourage Garden City police officers to act as police officers in other jurisdictions in violation of state law and in this case, it led to a violation of the Constitution.

For a county or city to be liable under § 1983, the plaintiff must show: (1) that he/she possessed a constitutional right of which he/she was deprived; (2) that the county had a policy; (3) that the policy amounts to deliberate indifference to plaintiff's constitutional right; and (4) that the policy is the moving force behind the constitutional violation.  *Oviatt v. Pearce*, 954 F.2d 1470, 1474 (9th Cir. 1992).  A municipality cannot be liable under § 1983 on a respondeat superior theory, that is, solely became it employs a tortfeasor.  *Monell v. Dep't of Soc. Servs. of New York City*, 436 U.S. 658, 691, 98 S. Ct. 2018, 56 L. Ed. 2d 611 (1978).  Summary judgment is proper where the nonmoving party has failed to raise a genuine issue of material fact regarding whether the alleged constitutional violations were the product of a city or county custom or practice. *Id*. at 690.

First off, even in the light most favorable to the Plaintiff, there does not appear to be a constitutional violation under the Fourth Amendment in this case as discussed above.  If there is no constitutional violation, then Garden City cannot be liable.  In the alternative and viewing things most favorably to Plaintiff, if she is able to make out a constitutional violation based on the officers acting outside their jurisdiction, for Garden City to be liable, there must be a custom, policy or practice that produces this conduct.  The only evidence the Plaintiff puts forward to support her allegation that Garden City has a policy and practice of acting outside its jurisdiction is its policy document and the cross-deputization agreement.  Even viewed most favorably, this evidence simply does not support her position.  The policy and agreement state that the Garden City police are allowed to act outside their jurisdiction when requested and this is in accordance with state law.[8]  Plaintiff presents no evidence that Garden City has a "policy" that is inconsistent with state law or violates the Constitution.  All Plaintiff states to support her position is that "this policy and [agreement] are read and implemented in such a fashion as to encourage Garden City police officers to act as police officers in other jurisdictions in violation of state law."  (Plaintiff Opposition,  p. 14).  But there is clearly no evidence to support this statement.  Nothing indicates that Garden City had a practice or custom of acting outside its jurisdiction outside in opposition to the policy or the agreement, other than this present case and one occurrence does not constitute a "practice" or "custom" for purposes of § 1983 liability.  In

---

[8] Idaho Code § 67-2337(2): All authority that applies to peace officers when performing their assigned functions and duties with the territorial limits of the respective city or political subdivisions, where they are employed, shall apply to them outside such territorial limits to the same degree and extent only when any one of the following conditions exist: (a) a request for law enforcement assistance is made by a law enforcement agency of said jurisdiction; (b) the peace officer possesses probable cause to believe a crime is occurring involving a felony or an immediate threat of serious bodily injury or death to any person; (c) when a peace officer is in fresh pursuit... I.C. § 67-2337(4): Cities or political subdivisions may enter into mutual assistance compacts with other cities or political subdivisions of this state or of states immediately adjacent.

**Memorandum Decision and Order - Page 24**

viewing the evidence most favorable to the Plaintiff, there appears no genuine issue of material fact regarding this aspect of her claim.  Even if she could make out an argument for a constitutional violation, there is still no evidence of a practice or custom that Garden City has that caused the alleged constitutional violation.  When there is no genuine issue of material fact, summary judgment is appropriate.

## ORDER

Based upon the foregoing, the Court being otherwise fully advised in the premises, the Court **hereby ORDERS that:**

1)      Defendants Sarrazolla, Wallace, and Bensley's Motion for Summary Judgment (Docket No. 4), filed June 9, 2006, be **GRANTED**.

2) Defendant Bensley and Garden City's Motion for Summary Judgment (Docket No. 4), filed June 9, 2006, be **GRANTED.**

DATED: October 3, 2006

Honorable Mikel H. Williams
United States Magistrate Judge